## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

CURTIS JOSEPH K.,

        *Plaintiff,*

  vs.                          Case No. 2:22-cv-02136-EFM

KILOLO KIJAKAZI,
Acting Commissioner of Social Security,

        *Defendant.*

## MEMORANDUM AND ORDER

Plaintiff Curtis Joseph K. brings this action seeking review of the final decision by Defendant, the Acting Commissioner of Social Security ("Commissioner") denying his application for disability benefits after June 10, 2015, under Title II of the Social Security Act (the "Act"), 42 U.S.C. § 401 et seq.  Plaintiff alleges that the administrative law judge ("ALJ") erred in weighing the opinion evidence and misconstruing the record.  Therefore, Plaintiff argues, substantial evidence did not support the ALJ's assessment of his residual functional capacity ("RFC").  Plaintiff further contends that without an RFC supported by the record, the Commissioner failed to meet her burden at step five in the Act's disability analysis.  Because, however, the Court finds that substantial evidence supports the ALJ's findings, the ALJ's decision is affirmed.

# I.        Factual and Procedural Background

Plaintiff is a 36-year-old male claiming June 10, 2015, was the onset date of his disabilities at issue before this Court.  Although Plaintiff suffers from physical issues with his shoulder, it is only his mental issues that are at issue on appeal.

## A.        An overview of Plaintiff's mental health history and assessments

It is undisputed that Plaintiff suffers from attention deficit hyperactivity disorder (ADHD), limited insight and judgment, anxiety, and oppositional defiant disorder (ODD).  At issue, rather, is the degree to which Plaintiff's mental limitations affect his ability to work.  A review of Plaintiff's treatment history after the alleged onset date is necessary to understand the issues in the case.

### 1.        Dr. Berg

In July 2016, Dr. Melvin R. Berg examined Plaintiff.  Observing that Plaintiff was appropriately dressed and groomed, Dr. Berg opined that Plaintiff's intellectual abilities fell within the low average to average range.  Plaintiff's thinking was logical, coherent, and reality based, and he was able to attend to and process simple information.  Dr. Berg eventually concluded that Plaintiff was able to accommodate the demands of superficial interpersonal interactions without any significant limitations.  Dr. Berg did, however, note that Plaintiff was prone to lapses in attention, but provided no further support or analysis of that fact nor how it would affect Plaintiff on the job.  For his part, Plaintiff shared that he performed daily chores, took care of himself and his dog, and had driven himself to the interview, and had been using unprescribed pain medication.  Plaintiff successfully performed multiple cognitive problems, including spelling "WORLD" in reverse, solving seven arithmetic problems (including serial subtractions), and retaining and executing simple instructions without issue.

2.      *Treating sources: Nurse Mindrup and Dr. Patriarca*

Between 2015 and 2021, Plaintiff received treatment from and underwent numerous, albeit sporadic, exams by APRN Joseph Mindrup, Plaintiff's treating source at High Plains Mental Health Center.  Mindrup consistently noted Plaintiff's poor insight and judgment, anxiety, and irritability/anger, but also his intact memory, logical thought form, and intact attention and concentration.  Mindrup also commented that Plaintiff's ADHD and anxiety appeared to be "well controlled" when Plaintiff took his meds.  Likewise, Plaintiff's irritability responded well to a trial of olanzapine.

A reoccurring issue was, however, that Plaintiff failed to consistently comply with his treatment.  For example, Nurse Mindrup noted that Plaintiff "[d]oesn't always take his Trazodone," had "not started the mirtazapine," it was "unclear" if Plaintiff had used Hydroxyzine, and Plaintiff consistently overdosed on alprazolam.  Nurse Mindrup acknowledged that difficulty affording medication might be a contributing factor and believed Plaintiff was eligible for financial assistance.  He even provided an application for Plaintiff to complete and submit but Plaintiff "never turned it in."  Despite the mild to moderate limitations assessed by Nurse Mindrup, there is no indication he ever suggested any treatment other than meds for Plaintiff.  Indeed, Plaintiff explicitly preferred a "meds only" course of treatment.  Furthermore, Plaintiff's visits to Nurse Mindrup were sporadic, with anywhere from seven to nine months passing between most visits.  Although Nurse Mindrup once noted Plaintiff's disheveled appearance, he also noted that Plaintiff appeared appropriately dressed and groomed on most occasions.

Despite these assessments, Nurse Mindrup opined in July 2018 that Plaintiff was unable to maintain a job because of his ADHD, anxiety, and depression.  The opinion was signed by Dr. Patriarca and will be referred to as Dr. Patriarca's medical opinion below.  This was the only

occasion Plaintiff's treating source opined on whether Plaintiff could function in a work environment.

Most recently, Nurse Mindrup saw Plaintiff in February 2021, 11 months after the prior exam. Plaintiff was appropriately groomed and dressed, with non-pressured speech, normal rate, tone, and latency, as well as a coherent thought processes. Plaintiff did show signs of anxiety and being easily distracted. He stated that he had been dealing with anger and irritability. At that exam, Plaintiff admitted to having been off his medication for two to three months. However, he also stated that he had been taking Adderall he had found recently when "he moved some things recently." To address Plaintiff's irritability, Nurse Mindrup put him on Lamotrigine and Sertraline, with the intent to consider further options after those medications stabilized Plaintiff's moods.

3.   *State Agency opinion: Drs. Stern and Locke*

The State Agency,[1] through psychologists Dr. George W. Stern and Dr. Joseph P. Locke, ultimately opined that Plaintiff should be limited to three-to-four step instructions. The State Agency observed that Plaintiff was moderately limited in remembering and carrying out detailed instructions, maintaining concentration and attention for extended periods, and working in coordination with others without distraction. However, the State Agency found no significant limitation regarding Plaintiff's ability to: (1) remember location and work-life procedures; (2) understand, remember, and carry out very short and simple instructions; (3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (4) make simple work-related decisions; (5) complete a normal workday and workweek without

---

[1] The "State Agency" referenced by the ALJ and the parties is left undefined by them.

interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and (6) get along with coworkers or peers and maintain socially appropriate behavior while adhering to basic standards of neatness and cleanliness.

### 4. Dr. Schwartz

In October 2021, Dr. Michael Schwartz, Ph.D., examined Plaintiff.  He opined that Plaintiff was of average intelligence with a bouncy and almost childlike persona very consistent with ADHD.  Plaintiff shared that he was able to perform personal hygiene, bake a cake, and handle money well.  At the time, he was not on Adderall or alprazolam, medications which had helped control his symptoms in the past.  He successfully performed multiple serial additions and subtractions, with Dr. Schwartz concluding that Plaintiff was of average intelligence.   In conclusion, Dr. Schwartz stated:

> Because of his problems with concentrating and his rather labile affect, I believe it would be difficult for him to understand and follow simple instructions on a consistent basis. Because of his labile emotions and rather intense presentation, I believe it would be difficult for him to maintain adequate social interactions on the job. I did not note any discrepancies between the allegations and the objective observations. I do not believe he could maintain adequate concentration, persistence, and pace on the job.

## B.   Procedural history

This case has been ongoing for over six and a half years.  Plaintiff first filed for disability on January 11, 2016.  The ALJ initially denied benefits on July 25, 2018, but that decision was reversed and remanded by this Court in September 2020 because the ALJ had failed to address multiple medical opinions on the record.[2]

---

[2] *See Curtis Joseph K. v. Saul*, 2020 WL 5369354, at *4 (D. Kan. 2020).

On remand, the ALJ once again denied benefits after determining Plaintiff's RFC as follows:

> The claimant can understand, remember, and apply instructions to perform simple, repetitive tasks. The claimant can make work decisions commensurate with those tasks. The claimant can concentrate to work at a consistent pace for two-hour periods before and after customary breaks and meet production requirement that allow him to sustain a flexible and goal-oriented pace but not assembly line work. The claimant must work in a stable setting with pre-determined work goals, and he can tolerate occasional interactions with coworkers and the general public in jobs that do not require tandem tasks, sales, customer service, or dispute resolution[.]

In arriving at this RFC, the ALJ found Dr. Schwartz's and Dr. Patriarca's opinions inconsistent with the record as a whole. Instead, he gave greater weight to the opinions of Dr. Berg, the State Agency, and Nurse Mindrup's evaluations showing that Plaintiff's symptoms had mostly been well managed by medication, at least when Plaintiff consistently took his medication.

Finding that Plaintiff was unable to perform any of his past work with his current RFC, the ALJ relayed Plaintiff's RFC to a vocational expert ("VE"). In response, the VE testified that there were three jobs Plaintiff could perform: collator operator (GED reasoning level two, with 44,000 jobs nationally), routing clerk (GED reasoning level two, with 104,000 jobs nationally), and cleaner/housekeeping (GED reasoning level one, with 137,000 jobs nationally). Based on the VE's testimony, the ALJ found that Plaintiff was not disabled under step five of the Act's analysis.

Once again denied disability benefits, Plaintiff brought this present action under 42 U.S.C. § 405(g). Because of how long the case has been in progress, Plaintiff requests that the Court forego remand and instead reverse the ALJ's decision and immediately grant Plaintiff's requested disability benefits.

## II.     Legal Standard

Judicial review of the Commissioner's decision is guided by the Act, which provides that the Commissioner's findings as to any fact, if supported by substantial evidence, shall be conclusive.[3]  The Court must therefore determine whether the Commissioner's factual findings are supported by substantial evidence and whether the ALJ applied the correct legal standard.[4] "Substantial evidence is more than a scintilla, but less than a preponderance; in short, it is such evidence as a reasonable mind might accept to support the conclusion."[5]  "A finding of no substantial evidence will be found only where there is a 'conspicuous absence of credible choices' or no contrary medical evidence."[6]  The Court may "neither reweigh the evidence nor substitute [its] judgment for that of the [Commissioner]."[7]

An individual is disabled under the Act only if she can "establish that she has a physical or mental impairment which prevents her from engaging in substantial gainful activity and is expected to result in death or to last for a continuous period of at least twelve months."[8]  This impairment "must be severe enough that she is unable to perform her past relevant work, and further cannot engage in other substantial gainful work existing in the national economy, considering her age, education, and work experience."[9]  The Social Security Administration has

---

[3] 42 U.S.C. § 405(g).

[4] *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

[5] *Barkley v. Astrue*, 2010 WL 3001753, at *1 (D. Kan. 2010) (citing *Castellano v. Sec'y of Health & Human Servs.*, 26 F.3d 1027, 1028 (10th Cir. 1994)).

[6] *Trimiar v. Sullivan*, 966 F.2d 1326, 1329 (10th Cir. 1992) (further citations and quotations omitted).

[7] *Bowman v. Astrue*, 511 F.3d 1270, 1272 (10th Cir. 2008) (quoting *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 800 (10th Cir. 1991)).

[8] *Brennan v. Astrue*, 501 F. Supp. 2d 1303, 1306-07 (D. Kan. 2007) (citing 42 U.S.C. § 423(d)).

[9] *Barkley*, 2010 WL 3001753, at *2 (citing *Barnhart v. Walton*, 535 U.S. 212, 217-22 (2002); 20 C.F.R. § 416.920 (2005)).

established a five-step sequential evaluation process for determining whether an individual is disabled.[10]   The steps are designed to be followed in order.  If it is determined, at any step of the evaluation process, that the claimant is or is not disabled, further evaluation under a subsequent step is unnecessary.[11]

The first three steps of the sequential evaluation require the ALJ to assess: (1) whether the claimant has engaged in substantial gainful activity since the onset of the alleged disability; (2) whether the claimant has a severe, or combination of severe, impairments; and (3) whether the severity of those impairments meets or equals a designated list of impairments.[12]  If the impairment does not meet or equal one of these designated impairments, the ALJ must then determine the claimant's RFC, which is the claimant's ability "to do physical and mental work activities on a sustained basis despite limitations from her impairments."[13]

After assessing the claimant's RFC, the ALJ continues to steps four and five, which require the ALJ to determine whether the claimant can perform her past relevant work, and if not, then whether she can generally perform other work that exists in the national economy.[14]  The claimant bears the burden in steps one through four to prove a disability that prevents the performance of her past relevant work.[15]  The burden then shifts to the Commissioner at step five to show that, despite his alleged impairments, the claimant can perform other work in the national economy.[16]

---

[10] *Wilson v. Astrue*, 602 F.3d 1136, 1139 (10th Cir. 2010); *see also* 20 C.F.R. § 404.1520(a).

[11] *Barkley*, 2010 WL 3001753, at *2.

[12] *Lax*, 489 F.3d at 1084; *see also Barkley*, 2010 WL 3001753, at *2 (citing *Williams v. Bowen*, 844 F.2d 748, 751 (10th Cir. 1988)).

[13] *Barkley*, 2010 WL 3001753, at *2; *see also* 20 C.F.R. §§ 404.1520(e), 404.1545.

[14] *Barkley*, 2010 WL 3001753, at *2 (citing *Williams*, 844 F.2d at 751).

[15] *Lax*, 489 F.3d at 1084.

[16] *Id.*

### III.    Analysis

The ultimate issue before the Court is whether the Commissioner met his burden at step five by showing that Plaintiff could perform jobs that exist in the national economy in significant numbers. To answer that question requires an examination of the RFC the ALJ provided to the VE to determine if it was supported by substantial evidence. Plaintiff, of course, argues that it was not. In particular, Plaintiff challenges the ALJ's weighing of Dr. Schwartz's and Dr. Patriarca's opinions, the ALJ's characterization of the record, and the ALJ's failure to include limitations mentioned by the State Agency opinion and Dr. Berg in the RFC. According to Plaintiff, these missteps resulted in the ALJ arriving at an unsupported RFC which prevented the VE's testimony from being substantial evidence to support the Commissioner's burden at step five. The Commissioner's response is relatively simple—substantial evidence supports each of the ALJ's findings.

**A.    The ALJ's decision to give little weight to Dr. Schwartz's and Dr. Patriarca's opinions was supported by substantial evidence.**

Plaintiff makes two arguments in contending that the ALJ improperly weighed Dr. Schwartz's and Dr. Patriarca's medical opinions. First, Plaintiff argues that the ALJ substituted his own lay assessment for Dr. Schwartz's and Dr. Patriarca's opinions by failing to analyze them under the relevant regulatory factors. Next, Plaintiff argues that the ALJ improperly "cherry picked" the evidence upon which he relied in finding Dr. Schwartz's and Dr. Patriarca's opinions unsupported by the record. Neither of these arguments is persuasive.

1.      *The ALJ properly analyzed Dr. Schwartz's and Dr. Patriarca's opinion under the appropriate factors*

As an initial matter, "the ALJ, not a physician, is charged with determining a claimant's RFC from the medical record."[17]   Therefore, any findings by a physician that a plaintiff is "disabled," "unable to work," or other similar language does not mean that the ALJ will determine that the plaintiff is in fact disabled.[18]   In fact, the Tenth Circuit has held "there is no requirement in the regulations for a direct correspondence between an RFC finding and a specific medical opinion on the functional capacity in question."[19]   However, "[i]f the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."[20]

The ALJ must address each medical opinion in arriving at a plaintiff's RFC under six factors set out by the regulations.[21]   As summarized by the Tenth Circuit, these factors are:

> (1) [T]he length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[22]

---

[17] *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir. 2004); *see also* 20 C.F.R. § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as whether your impairment(s) meets or equals the requirements of any impairment(s) in the Listing of Impairments in appendix 1 to this subpart, your residual functional capacity (see §§ 404.1545 and 404.1546), or the application of vocational factors, the final responsibility for deciding these issues is reserved to the Commissioner.").

[18] 20 C.F.R. § 404.1527(d)(1).

[19] *Chapo v. Astrue*, 682 F.3d 1285, 1288 (10th Cir. 2012).

[20] SSR 96-8p, 1996 WL 374184, at *7; *see* 20 C.F.R. §§ 404.1527(c)(1)–(6), 416.927(c)(1)–(6) (listing factors).

[21] 20 C.F.R. § 404.1527(c).

[22] *Watkins v. Barnhart*, 350 F.3d 1297, 1301 (10th Cir. 2003) (further citation and quotation omitted).  These factors apply solely to cases filed by March 27, 2017.  *See* 20 C.F.R. § 404.1527 ("For claims filed (see § 404.614)

-10-

An ALJ's analysis need not "need not include an explicit discussion of each factor."[23] However, "the record must reflect that the ALJ considered every factor in the weight calculation."[24] Furthermore, an ALJ may not substitute "his or her own credibility judgments, speculation or lay opinion" for that of a treating physician's.[25] Instead, an ALJ may only reject a treating physician's opinion "on the basis of contradictory medical evidence."[26] Deciding not to give an opinion much weight because it conflicts with the record as a whole is a proper action for the ALJ to take.[27]

Plaintiff spends all of a quarter of a sentence disputing that the ALJ properly analyzed each of these factors regarding Dr. Schwartz's and Dr. Patriarca's opinions. A brief analysis shows otherwise. Although the ALJ did not explicitly discuss each factor, the record indicates he considered each.

With Dr. Schwartz, the ALJ noted that he was an examining expert with a Ph.D. who had only one interaction with Plaintiff. Most of the ALJ's analysis was spent examining the discrepancies between Dr. Schwartz's opinion and the rest of the record, i.e., factors three, four,

---

before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

[23] *See Andersen v. Astrue*, 319 F. App'x 712, 718 (10th Cir. 2009) (emphasis omitted).

[24] *Id.* (emphasis omitted); *see also* SSR 96–2p, 1996 WL 374188, at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.").

[25] *McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002) (further citation, quotations, and emphasis omitted).

[26] *Id.*

[27] *See Trujillo v. Colvin*, 626 F. App'x 749, 753 (10th Cir. 2015) ("[The ALJ] had an obligation to determine what Ms. Trujillo could do in spite of her limitations (what the regulations call her 'residual functional capacity'). The [ALJ] was simply carrying out that obligation when analyzing Dr. Pelc's assessment against the backdrop of the other psychological evidence involving mood swings and lability.").

and arguably six.  First, the ALJ noted that during that examination, Plaintiff did not appear to be on his medication, a reasonable inference in light of the "context of little evidence of current treatment and past mental status examinations showing that the claimant's presentation, attention, and concentration have been managed with medications."  Furthermore, Plaintiff's "reported activities of daily living, work history, and mental status examinations during the longitudinal period suggest a maximum RFC that exceeds the limitations appreciated by Dr. Schwartz." Considering each factor, the ALJ found Dr. Schwartz's opinion to be of limited weight.

Likewise, Nurse Mindrup and Dr. Patriarca were acknowledged by the ALJ as treating sources, although there is no indication that they were otherwise "specialists" in assessing mental limitations.  The ALJ then correctly notes that Dr. Patriarca's opinion that Plaintiff could not work due to mood symptoms was in essence a legal conclusion reserved to the Commissioner, not any physician.  The ALJ acknowledged the supporting evidence of Plaintiff's limited judgment and insight but found the rest of the treating sources' opinion to be unsupported by the evidence. Specifically, the ALJ found:

> The claimant has demonstrated limited insight and judgment, but has been cooperative with this provider and appears to be able to interact with him regarding treatment options.  Although High Plains notes document significant anxiety, similar findings have not been documented by other medical providers, including his extensive physical examinations with related MSEs.  The claimant has worked full time in the past and has indicated that he performs activities of daily living independently, weighing against the provider's opinion that he is markedly limited in each domain, which is a level of limitation not documented by other providers. Additionally, the providers failed to acknowledge the claimant's history of noncompliance and a rather disjointed pursuit of mental health treatment.  More importantly, this portion of the explanation offered in support of the opinion appears to stand at odds with the fact that contemporaneous treatment notes document repeated reports of effective management of ADHD symptoms with medication and only mild impairment stemming from it.

This is a clear and concise evaluation of factors three, four, and six.  In giving limited weight to both Dr. Schwartz and Dr. Patriarca, the ALJ relied not on his own opinion but upon contradictory medical evidence.  Therefore, Plaintiff's brief and unargued assertion that the ALJ failed to apply the relevant factors in assessing Dr. Schwartz's and the treating sources' opinions is without merit.

   2.   *The ALJ's characterization of the record is supported by substantial evidence.*

   In the body of his argument, Plaintiff disagrees that the record is for the most part contrary to Dr. Schwartz's and Dr. Patriarca's opinions.  Plaintiff's main contention is that the ALJ "cherry picked" evidence to support his lay opinion.  This alleged cherry picking then resulted in a characterization of the record that was contrary to Dr. Schwartz's and Dr. Patriarca's opinions. Plaintiff focuses his argument regarding the ALJ's alleged cherry picking on two specific string cites employed by the ALJ to support two specific sentences.  The Court finds it obvious that it is Plaintiff himself who is cherry picking his evidence through misconstruing or omitting relevant statements from the evidence cited by the ALJ.

   The ALJ's first statement with which Plaintiff takes issue is "[n]otably, his course of treatment has been marked by lengthy gaps in treatment, a lack of interest in engaging in therapy services, and inconsistent medication compliance."  The ALJ made this statement in connection with his assessment that Plaintiff's mental limitations were not as severe as Plaintiff alleged.[28]  In

---

[28] "If the frequency or extent of the treatment sought by an individual is not comparable with the degree of the individual's subjective complaints, or if the individual fails to follow prescribed treatment that might improve symptoms, we may find the alleged intensity and persistence of an individual's symptoms are inconsistent with the overall evidence of record." SSR 16-3p, 2017 WL 5180304, at *9.

support of this statement, the ALJ cited to "Exhibits C10F, pp. 7, 33, 66, 86, 89;[29] C24F [Nurse Mindrup's evaluations 11/2015–1/2017], pp. 7, 9, 11, 13, 15, 16, 19; C36F [a duplicate of C24F], p. 10; C37F [a record of Plaintiff's visit to one Dr. Kuhlman regarding his medication], p. 3; C42F [showing an emergency room visit regarding Plaintiff's withdrawal symptoms], p. 7; C43F [further records from Nurse Mindrup], pp. 3, 6."  Plaintiff spends a good deal of time describing the exhibits dealing with Plaintiff's treatment after the onset date but fails to mention key elements upon which the ALJ's statement may reasonably rest.

For example, Exhibit C24F clearly states (twice) that Plaintiff "[d]oesn't always take his Trazodone" and that he "[p]refers meds only."  Furthermore, Plaintiff had "not started the mirtazapine" and it was "unclear" if Plaintiff had used Hydroxyzine.  Likewise, Exhibit C36F reveals that Plaintiff "doesn't always take the Trazodone" and sometimes overdosed on alprazolam. Exhibit C37F seems out of place, as it deals primarily with Plaintiff's pain medication, but it could show Plaintiff's tendency to misuse his meds.  Exhibit C42F shows Plaintiff experiencing withdrawal from his depressants and failing to pick up his alprazolam.  Finally, Exhibit C43F shows a nine-month gap in treatment as well as Plaintiff's failure to take his meds "for at least 2 to 3 months" after a 20-month gap in treatment.[30]  Each of these statements, omitted

---

[29] The Court agrees that the first exhibit cited by the ALJ, C10F, both supports the ALJ's statement that Plaintiff's treatment underwent lengthy gaps and is irrelevant to this case as evidence of Plaintiff's condition before the onset date.

[30] Plaintiff argues that the reference to being off his meds for two to three months refers to Plaintiff's pain medication.  The context of the medical report makes clear that Plaintiff and his treating physician were discussing Plaintiff's anxiety, ADHD, and mood stabilizer medication.  The reference to "He says he is no longer taking his pain meds" occurs in a different paragraph under "Chief Complaint/Reasons for Visit – Last Visit" whereas the reference to being off his medications for two to three months occurs under "Today's Chief Complaint/Reason for Visit." Furthermore, the context of the paragraph makes clear that in response to Plaintiff's statement, the treating physician intended to put Plaintiff on a mood stabilizer and that Plaintiff was not prescribed Adderall at that time.  These statements would be entirely out of place if the discussion of being of his meds "for at least 2 to 3 months" were referring to pain medication.

or mischaracterized by the Plaintiff in his brief, support the ALJ's finding that Plaintiff underwent lengthy gaps in treatment, showed a lack of interest in therapy, and inconsistently complied with his medication.

Similarly, Plaintiff's second attempt to dissect one of the ALJ's string cites falls well short of establishing that the ALJ's decision was not supported by substantial evidence. Here, the statement at issue is "even with such a limited and conservative course of mental health treatment apart from medication, mental status examinations throughout the record have consistently failed to yield persistent or significant abnormalities." In support of this statement, the ALJ cites "Exhibits C1F at 6,10,15,19;[31] C10F [Nurse Mindrup's evaluation in 2015] at 109; C17F [Dr. Berg's opinion]; C21F [a medical evaluation in 2016]; C24F [Nurse Mindrup's evaluation] at 8,11,14,15,18; C25F [other medical records 3/2016–1/2017] at 4,7,10,13,16,19; C38F [summary of discharge from substance abuse treatment center in 2020] at 4; [and] C42F at 7; C43F at 6,16, 30."

Plaintiff admits that Exhibit C10F shows a "generally benign mental status examination." To controvert the ALJ's reliance on Exhibit C17F, Plaintiff quotes a single sentence by Dr. Berg that Plaintiff "is prone to lapses in attention which can interfere with him being able to perform tasks in a reliable manner." Plaintiff does not attempt to explain how this is evidence of a persistent or significant abnormality. Neither does Plaintiff address the myriad statements from C17F which support the ALJ's determination.[32] Moving on, Plaintiff fails to address the fact that Exhibit C21F

---

[31] The Court agrees with Plaintiff that because these records are from before the alleged onset date they are irrelevant to the present case.

[32] Here are simply a few relevant statements: "[Plaintiff] is functioning within the low average to average range of intellectual abilities . . . . His thinking is logical, coherent, and reality based. [Plaintiff] was able to attend to and process simple information . . . . [Plaintiff] is able to accommodate the demands of superficial interpersonal interactions, and does not have any significant limitations in this area."

clearly states "[t]he patient was alert and oriented . . . . Speech is clear and coherent . . . . Memory, concentration, and general fund of knowledge are intact." Although it also states that Plaintiff's insight and judgement were poor and he was easily agitated—acts not disputed by the ALJ—C21F can be reasonably interpreted to support the ALJ's conclusion.

When it comes to Exhibit C24F, Plaintiff once again concedes that it "is somewhat benign." Given this concession, it is unclear what Plaintiff wishes the Court to take from his continued argument that Plaintiff exhibited poor insight and judgment as well as anxiety. Plaintiff ignores that Exhibit C25F continually references Plaintiff's "appropriate affect and demeanor; good insight and judgment." Likewise, Exhibit C38F states that Plaintiff was "cooperative" and "oriented on all spheres." Furthermore, "[h]is memory appeared to be intact." Finally, Plaintiff claims that he "was consistently described in [C43F] as disheveled, anxious, irritable and angry, and distractible and/or as having poor judgment/insight." The Court concurs that this exhibit consistently mentions Plaintiff's anxiety, poor insight and judgment, and his anger issues with his mother. None of this makes ALJ's finding that Plaintiff lacked persistent or significant abnormalities facially unreasonable because C43F makes no mention of the more severe limitations assessed by Dr. Schwartz or Dr. Patriarca.

Notably, Plaintiff does not cite to any other evidence to contradict the ALJ's finding except the opinions of Dr. Schwartz and Dr. Patriarca. As the ALJ specifically addresses and assigns a lower weight to these opinions, an analysis with which Plaintiff might disagree but raises no other objection to, they do not contradict the ALJ's findings as to the entire record.

Despite the in-depth discussion of the evidence necessitated by Plaintiff's nit-picking two sentences and their attached string cites, the Court cannot mistake the trees for the forest. It is clear from the foregoing discussion that more than a mere scintilla of evidence supported the ALJ's

determination that the record as a whole did not show that Plaintiff had severe mental limitations. Apart from his citations to Dr. Schwartz's and Dr. Patriarca's opinions, Plaintiff does not argue, much less show, how the symptoms that were present throughout treatment —anxiety, poor insight and judgment, anger towards his mother—conflict with the RFC the ALJ issued in this case.

   3.    *The ALJ did not improperly weigh Plaintiff's occasional difficulty affording treatment against Plaintiff*

   Plaintiff raises two other related objections to the ALJ's findings on the record.  First, Plaintiff argues that the ALJ improperly failed to follow 20 C.F.R. § 404.1530 in factoring in Plaintiff's "noncompliance" with prescribed treatment.  Section 404.1530 requires the ALJ to consider any "good reason" that might exist for the plaintiff's noncompliance with prescribed treatment if failure to follow that treatment is the reason for the ALJ's finding that the plaintiff is not disabled.  However, the ALJ can only consider failure to follow prescribed treatment "if this treatment is expected to restore your ability to work."[33]  For example, an ALJ is justified in denying disability benefits for a plaintiff's respiratory problems when "the failure to stop smoking, when that is the prescribed treatment, is grounds for denying benefits."[34]

   Here, 20 C.F.R. § 404.1530 does not apply because the ALJ did not deny Plaintiff benefits based on his noncompliance with a prescribed treatment.[35]  The ALJ merely pointed to the gaps in treatment, lack of consistency with medication, and lack of pursuing therapy as evidence that Plaintiff's condition is not as severe as some of the medical opinions state.  He did not use

---

[33] 20 C.F.R. § 404.1530(a).

[34] *Cowan v. Astrue*, 552 F.3d 1182, 1191 (10th Cir. 2008) (giving an example of denying benefits based on noncompliance with prescribed treatment).

[35] *See, e.g.*, *Qualls v. Apfel*, 206 F.3d 1368, 1372–73 (10th Cir. 2000) (upholding ALJ decision when ALJ considered plaintiff's failure to seek treatment for reasons other than denying benefits to an otherwise disabled plaintiff).

Plaintiff's noncompliance as a basis for denying disability benefits.   Furthermore, the ALJ discussed Plaintiff's noncompliance not in the context of denying him disability benefits or even assessing his credibility but rather when evaluating the weight of medical opinion evidence against the record.   Plaintiff fails to cite any authority showing that 20 C.F.R. § 404.1530 applies to this context.   Therefore, the ALJ was not required to address Plaintiff's "good reasons" for failing to comply with his treatment.

Even if 20 C.F.R. § 404.1530 applied, it is clear from the ALJ's opinion that he *did* consider Plaintiff's "apparent inability to consistently afford medications."   With that in mind, the ALJ nevertheless found that Plaintiff's "mental status exams have not indicated significant limitations in the claimant's thought process, which has remained logical, his memory, or his attention span and concentration."   In other words, this factor weighed in Plaintiff's favor but not enough to upset the weight of the record as a whole.   Furthermore, while some evidence exists of Plaintiff's occasional difficulty affording medication, there is no indication he has even been turned away from receiving free or low-cost medical prescription services.   There is no evidence he has ever tried to do so.   Rather, evidence in the record shows that Plaintiff has consistently failed to apply for financial assistance for his medications, even though his treating physician urged him to and provided him a form to fill out.[36]   Because there is no evidence that Plaintiff was ever refused medical services or medication due to his inability to pay, the ALJ was not obliged to excuse Plaintiff's non-compliance with medication in deciding that the record did not support Plaintiff's alleged symptoms.

---

[36] *See, e.g.*, *id.* at 1373 ("Plaintiff further argues that the ALJ could not consider his failure to seek medical treatment or take pain medication because of his indigence. The ALJ specifically found that free medical care was available, however, and plaintiff does not dispute this finding.").

**B.     Any failure on the part of the ALJ to reconcile the State Agency's and Dr. Berg's opinions with Plaintiff's RFC is harmless error.**

As a corollary to Plaintiff's main argument, Plaintiff also contends that the ALJ failed to address specific limitations included in the State Agency's and Dr. Berg's opinions.  First, Plaintiff argues that the ALJ failed to address the State Agency's recommendation to three to four step instructions.  Second, Plaintiff argues that his RFC is at odds with Dr. Berg's statements regarding Plaintiff's distractibility and superficial interpersonal interactions.

"If the RFC assessment conflicts with an opinion from a medical source, the ALJ must explain why the opinion was not adopted."[37]  An RFC conflicts with a medical opinion when it expressly adopts specific restrictions within that opinion while leaving out others without comment.[38]

*1.     Any conflict between Plaintiff's RFC and the State Agency's three-to-four step instructions limitation is harmless error.*

The first question is whether Plaintiff's RFC is inconsistent with the State Agency's opinion that Plaintiff should be limited to three-to-four step instructions.[39]  There is no mention of this specific limitation in the ALJ's opinion.  That leaves the Court to determine if the Plaintiff's RFC limitation to "simple, repetitive tasks" is essentially equivalent to a three-to-four step

---

[37] *M.H. v. Saul*, 2020 WL 916856, at *4 (D. Kan. 2020); *see also Wilson v. Colvin*, 541 F. App'x 869, 873–74 (10th Cir. 2013) ("We therefore agree with Ms. Wilson that the ALJ's RFC, as stated in the decision, is not generally consistent with Dr. LaGrand's medical opinion, and the ALJ's failure to weigh that opinion and explain why he accepted some, but not all, of its moderate restrictions, was not harmless error.").

[38] *Haga v. Astrue*, 482 F.3d 1205, 1207–08 (10th Cir. 2007).

[39] *See, e.g., Monique M. v. Saul*, 2020 WL 5819659, at *8 (D. Kan., 2020) ("Moreover, as quoted above, the court in Wilson found the RFC was inconsistent with Dr. LaGrand's opinion whereas this court finds the RFC assessed here is not inconsistent with Dr. Schultz's opinion regarding migraines."); *Sullivan v. Colvin*, 519 F. App'x 985, 988–89 (10th Cir. 2013) (holding that RFC was not inconsistent with medical opinion but merely stated the issue differently).

instructions limitation.   If a conflict exists between the limitation and Plaintiff's RFC, the Commissioner argues that the harmless error rule applies.

This Court recently decided "whether there is a material inconsistency between [a medical] opinion that [p]laintiff should be limited to one-to-two step instructions and her RFC limiting her to 'detailed uninvolved instructions in the performance of simple, routine and repetitive tasks.' "[40] Ultimately, the Court held that a limitation to "detailed uninvolved instructions" was incompatible with the one-to-two step limitation contained in the physician's opinion.[41]  Although no caselaw or regulations define "detailed uninvolved instructions," the Court found the GED reasoning level definitions instructive.[42]   A GED reasoning level two requires a party to be able to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions."[43] In contrast, a GED reasoning level one requires that a party be able to "carry out simple one- or two-step instructions."[44]  Therefore, a limitation to "detailed uninvolved instructions" was facially in conflict with the medical opinion that the plaintiff should be limited to one-to-two step instructions.[45]

In the present case, it is not immediately clear that Plaintiff's RFC conflicts with the three-to-four step limitation listed by the State Agency.  Plaintiff has advanced no caselaw showing that three-to-four step instructions are incompatible with an RFC limiting Plaintiff to "simple repetitive

---

[40] *Karla M. v. Kijakazi*, 2022 WL 4597849, at *6 (D. Kan. 2022).

[41] *Id.* at *7.

[42] *Id.* at *6–7.

[43] DOT, Appendix C, Components of the Definition Trailer, 1991 WL 688702 (4th ed. rev. 1991).

[44] *Id.*

[45] *Karla M.*, 2022 WL 4597849, at *7.

tasks."   To put it another way, it is not apparent that Plaintiff's RFC does not encompass this limitation and Plaintiff makes no effort to show otherwise.

Nevertheless, the Court need not decide whether "simple, repetitive tasks" equivalate to three-to-four step instructions.   This is because a harmless error analysis, as argued by the Commissioner, is sufficient to show that the ALJ's failure to specifically include a limitation to three-to-four step instructions does not warrant remand or reversal.   Plaintiff does not address this argument in his Reply.

The Tenth Circuit has "held an ALJ's erroneous inclusion of some jobs to be harmless error where there remained a significant number of other jobs in the national economy."[46]  If even one of the jobs presented by the VE conforms with the record and exists in significant numbers in the national economy, then the Commissioner has met his step five burden.[47]  Although no bright-line rule exists as to what constitutes a "significant number," the Tenth Circuit has found 152,000 jobs to suffice.[48]  Other circuits and even the District of Kansas have found significant numbers of jobs when only 6,000–12,000 jobs existed in the national economy.[49]

Here, the VE listed three jobs in response to the ALJ describing Plaintiff's RFC: collator operator, routing clerk, and cleaner/housekeeping.  Of these, the collator operator and routing clerk positions require GED reasoning level two.  The cleaner/housekeeping position, however, requires only GED reasoning level one, i.e., one-to-two step instructions.  The VE testified that there were

---

[46] *Evans v. Colvin*, 640 F. App'x 731, 735 (10th Cir. 2016).

[47] *See Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009).

[48] *Stokes v. Astrue*, 274 F. App'x 675, 684 (10th Cir. 2008).

[49] *See White v. Kijakazi*, 2022 WL 1120517, at *8 (D. Kan. 2022) (summarizing caselaw from across circuit and district courts and ultimately finding harmless error when 12,000 jobs that the plaintiff could do remained); *see also Harrison v. Saul*, 2020 WL 1847735, at *6 (D. Kan. 2020) ("Here, the Court finds that as a matter of law, 45,000 is a significant number of jobs nationally.").

137,000 cleaner/housekeeping jobs in the national economy.  The Court has no hesitation, based on Tenth Circuit precedent and its own prior opinions, finding that 137,000 is a significant number of jobs nationally as a matter of law.  Because a significant number of jobs exist in the national economy that require only one-to-two step instructions, the ALJ's failure to include the State Agency's limitation of three-to-four step instructions is harmless.

   2.   *Dr. Berg's opinion and Plaintiff's RFC are not in conflict*

   Finally, Plaintiff argues that his RFC and Dr. Berg's medical opinion are in conflict. Naturally, this would require Dr. Berg to state specific limitations in his opinion which are not present in Plaintiff's RFC nor addressed elsewhere by the ALJ.  Plaintiff, however, does not identify any limitation specified by Dr. Berg.  In fact, the only two statements in Dr. Berg's opinion that Plaintiff relies upon in his argument are as follows:

- "The Claimant is able to attend to and process simple information such that he can perform unskilled tasks.  However, he is prone to lapses in attention which can interfere with him being able to perform tasks in a reliable manner."

- "The Claimant is able to accommodate the demands of superficial interpersonal interactions, and does not have any significant limitations in this area."

   The first of these statements appears to be an observation, not a specified limitation. Plaintiff does not suggest how the ALJ could have worked it into an RFC.  In any case, it is a conclusion without any support or explanation in Dr. Berg's opinion, as the ALJ noted in his decision.  Furthermore, the ALJ found that the record consistently showed that Plaintiff's ADHD has been well managed by Adderall.  Accordingly, the ALJ had substantial evidence to give limited weight to Dr. Berg's statement.

   Regarding the second statement, this again does not appear to be a limitation.  As the ALJ accurately stated, "[Dr. Berg's] opinion is based on an examination but it is arguably somewhat

internally inconsistent in that it suggests no significant social limitations but then only notes that the claimant can accommodate the demands of superficial interaction." Plaintiff's attempt to construe it as *limiting* Plaintiff to merely superficial interpersonal interactions is misleading. All Dr. Berg says is that Plaintiff has no significant limitations with superficial interpersonal interactions. He does not comment on Plaintiff's ability to deal with other levels of interpersonal interactions. Therefore, Plaintiff cannot show that his RFC conflicts with Dr. Berg's opinion.

In sum, the ALJ's determination of Plaintiff's RFC was supported by substantial evidence. Furthermore, the ALJ applied the correct legal standards in determining that Plaintiff is not disabled. Accordingly, the Commissioner has met her burden at step five by showing that there are a significant number of jobs in the national economy that Plaintiff could perform. Plaintiff, therefore, is not disabled under the Act.

**IT IS THEREFORE ORDERED** that the judgment of the Commissioner is **AFFIRMED**.

**IT IS SO ORDERED.**

This case is closed.

Dated this 8th day of November, 2022.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE